GARDEN, JUDGE:
These claims involve a multitude of issues arising on three separate contracts between Vecellio & Grogan, Inc. of Beckley, West Virginia, the claimant (hereinafter referred to as V & G), and the respondent. They will be discussed in the order in which they were presented at the hearing.
Issue No. 1. Federal Explosive Impost Charge (D-914)
On November 2, 1970, V & G entered into an agreement with respondent for the construction of 2.6 miles of U.S. 19 Express *295 way in Nicholas County, West Virginia, being respondent’s Project No. APD-482(30). By letter dated February 15, 1971, V & G’s explosive supplier advised V & G that, pursuant to the provisions of the Organized Crime Control Act of 1970, Commerce in Explosives, Part 181, and Internal Revenue Regulations issued pursuant thereto, Austin Powder Company was required to place an immediate impost on explosive sales. It was stipulated between the parties that these requirements were based on regulations promulgated in the Federal Register, Volume 36, Number 10, dated January 15, 1971, a copy of which was attached to the Stipulation. It was further stipulated that, as a result of explosives purchased to perform the above-mentioned contract, V & G was required to pay its explosive supplier the sum of $1,929.10 over and above the price set forth in their contract. A careful reading of the Federal Register fails to reveal any provision which would authorize the purchaser of explosives to pass this charge on to the ultimate consumer, namely, the respondent. We are also unaware of exactly when contract prices may be altered by respondent (with the exception of increases or decreases in common carrier freight rates). This Court feels that this is simply one of the hazards, unforseen as it may be, of doing business, and for this reason, this portion of the claim is denied.

Issue No. 2. Presplitting Technique (D-914)

An additional controversy has arisen in connection with the performance of contract APD-482(30) involving the dynamiting technique known as presplitting. This is a procedure which was first developed in the early 1960’s. It is a technique by which modern blasters split or crack a rock deposit along the line marking the edges of a cut prior to production blasting.
The specifications of the contract in question required that the technique of presplitting be followed. It was agreed that the performance of this contract was governed by respondent’s 1968 Standard Specifications — Roads and Bridges and by respondent’s Special Provisions dated January 1, 1970. Section 207.1 of the 1968 Standard Specifications reads in part as follows:
*296 “This work shall consist of excavation for the roadway . . .in reasonably close conformity with the lines, grades, thicknesses and cross sections shown on the plans or established by the Engineer.”
Section 207.3.1.1.2 of the 1968 Standard Specifications authorizes the use of the presplitting technique, but does not provide details as to how the technique is to be performed. Also, in another Section, 207.3.1.3, entitled Rock Excavation, the following appears:
“A tolerance of 18 inches, measured in a horizontal plane, for cut slopes back of the ditch line will be permitted in rock cuts ...”
To further complicate the matter, the respondent, in its January 1, 1970 Special Provisions, deleted former Section 207.3.1.1.2 and substituted the following:
“When called for in the contract, rock excavation shall incorporate the ‘presplitting’ technique. This involves a single row of holes drilled along the neat excavation line ... The end result is intended to yield a minimum of breakage outside the neat line of the plan cross sections.” (Emphasis added.)
Claimant readily admitted that it did not drill along the neat excavation line which was simply defined as the template line shown on the cross sections. V & G’s officers and employees testified that it is impossible to drill on the template line and ultimately arrive at the proper point in the ditch line as shown on the cross sections. They explained that the drilling equip-' ment currently being used by road contractors in West Virginia simply will not physically permit them to drill on template, and that as a result, they started their drilling behind template, believing that they were entitled to a tolerance of 18 inches as set forth in 207.3.1.3. The presplitting provisions are contained in a separate section, and in that section, tolerances are not mentioned and the contractor is required to drill on the neat excavation line.
For the main part, the respondent has refused to pay V & G for the excavation of this unclassified material behind the neat *297 excavation line. If back breaking due to poor material fell out, the record indicates that V & G was paid. While we feel that V & G is not entitled to the 18” tolerance, we are of the opinion that equity demands an extension of some tolerance to them, and we believe that a tolerance of 12 inches is equitable. With this figure in mind, we directed the respondent’s engineers and the officials of V & G to make a determination of the additional unclassified excavation performed by V & G, and to determine, at the rate of $0.99 per cubic yard, the additional compensation which should be paid to V & G.
The parties have reported to the Court that, as a result of the 12-inch tolerance outlined above, V & G is entitled to be paid for the excavation of an additional 6,264 cubic yards of unclassified material at the rate of $0.99 per cubic yard, or the sum of $6,201.36, and an award to V & G in that amount is hereby made.

Issue No. 3. Fat Fill (D-918)

On June 24, 1970, V & G entered into a contract with the respondent for the grading, draining, and paving of a portion of U.S. 460 Expressway in Mercer County, West Virginia, which was respondent’s Project No. APD-200 (19).
A written stipulation filed at the hearing reflects that V & G excavated 217,531 cubic yards of unclassified borrow excavation and that respondent certified and paid V & G for 203,495 cubic yards, or a difference of 14,036 cubic yards, and that the unit bid price was $0.89 per cubic yard. The parties further agreed that respondent’s 1968 Standard Specifications governed all work under the contract. The pertinent provisions of these Specifications are as follows:
Article 105.3
“All work performed and all materials furnished shall be in reasonably close conformity with the lines, grades, cross sections, dimensions and material requirements, including tolerances shown on the Plans, or indicated in the Specifications.” (Emphasis added.)
Article 105.8
“The Contractor shall be responsible for having the finished work in reasonably close conformity with the lines, grades, *298 elevations and dimensions called for in the Plans or established by the Engineer.” (Emphasis added.)
Article 207.1
“(Embankment) work shall consist of . . . constructing embankments with excavated material ... in accordance with these Specifications and in reasonably close conformity with the lines, grades, thicknesses and cross sections shown on the Plans or established by the Engineer.” (Emphasis added.)
Article 211.3.1
“If the borrow is obtained in such quantity or in such manner that a waste of unclassified excavation, slips or excess material is caused, the amounts of such waste shall be deducted from the borrow volume.”
It was remarked during the testimony in respect to this claim that all fills are fat, and this Court has concluded that such a statement is correct. Where fills are required on road construction, the contractor is furnished with cross sections showing the template lines of the slopes and, of course, a template line reflecting the location of the roadbed. The Standard Specifications require larger rocks to be placed near the outer part of the embankment and smaller rocks and spalls near the center. At the very bottom of the fill where rocks of three or four feet in diameter are used, some part of the rock by its very nature must extend beyond the template line in order to support material placed on them. Also, on the slopes where the sides of the embankment are being compacted by a bulldozer, it is necessary that extra material be used to obtain the required compaction and to make sure that the slope meets the template line.
It is to be noted that the Specifications repeatedly refer to “in reasonably close conformity”. What does this term mean? A witness for V & G was of the opinion that it meant a distance of six inches to two feet, whereas a witness for respondent opined that a distance of one foot would constitute “in reasonably close conformity”. It has come to the attention of the Court that on January 5, 1978, the respondent issued a Special Provision relating to Excavation and Embankment and added this language to Section 207.7.1:
*299 “Slope lines for all embankments shall conform to the lines shown on the Plans or established by the Engineer, except that a construction tolerance of plus or minus one foot, measured in a horizontal pliane, will he permitted, except further that the roadbed width due to the tolerance shall not be less than plan width . . (Emphasis added.)
Based on the testimony and all of the evidence in the record, this Court is of the opinion that one foot should be considered as being “in reasonably close conformity”. We requested the engineers for the respective parties to review and determine the actual fat fill on this job with this tolerance in mind so that a proper award might be made.
The parties have now agreed that within this one-foot line beyond the template lines there are 5,689 cubic yards of unclassified borrow or fat fill. The contract entitled V & G to be paid a unit price of $0.88 per cubic yard for this material, and, consequently, an award of $5,063.21 is hereby made in favor of V & G.
Issue No. 4. Deduction for Fat Fill on Contract which was Bid Originally as a Waste Job (D-993)
This issue, and the following three issues, deal with project APD-323(23). By agreement dated December 23, 1969, V & G contracted with the respondent to construct one segment of U. S. 119 Expressway in Mingo County, West Virginia. The testimony established that the plans indicated that the project would be a “waste job” as opposed to a “borrow job”. By way of explanation, a “waste job” is a project where the unclassified excavation in the cut areas provides more than sufficient suitable material to construct the fills and embankments in the same project. On the other hand, a “borrow job” is one where the unclassified excavation obtained from the cuts produces an insufficient amount of suitable material to construct the fills and embankments. In the latter situation, it becomes necessary for the contractor to borrow additional suitable material from the project site or outside of the project site, and, of course, the contractor in such instances submits a unit price bid for this item in submitting a bid.
*300 During the course of this construction, it became apparent to V & G that the amount of suitable material to be obtained from the cuts would be insufficient to construct the fills and embankments. By letter dated December 10, 1970, and introduced into evidence, V & G informed the respondent that a borrow in the range of 100,000 cubic yards would be necessary to complete the work and, apparently, with the approval of the respondent, V & G prepared additional plans and cross sections of various cuts on the project where V & G would excavate behind the template lines. From that source, V & G would obtain the additional needed suitable material to construct the fills and embankments.
It was stipulated by the parties that Y & G, in the performance of the contract, excavated a total of 1,871,199 cubic yards of unclassified excavation and was paid for all of the excavation at a unit bid price of $1.27 per cubic yard. However, when the final cross sections were taken by the respondent, a procedure in which V & G participated, it was determined that some 45,000 cubic yards of unclassified excavation were outside of the template lines of the fills and embankments as the template lines were shown on the original plans. As a result, the respondent deducted these 45,000 cubic yards as a fat fill at the above-stated unit price of $1.27, or a total of $57,150.00, from the final payment to V & G. Respondent contends that it had the right to make this deduction in the final pay pursuant to Section 1.5.1 of the 1960 Standard Specifications — Roads and Bridges, which reads in part as follows:
“... The Engineer shall determine the amount and quantity of the several kinds of work performed and materials furnished which are to be paid for under this Contract and his decision shall be final. . .”
V & G does not dispute the fact that the disputed 45,000 cubic yards of material were beyond the template lines, but it contends that this material consisted of material within one foot of the template line (“in reasonably close conformity,” as discussed earlier), unsuitable material, and material from slides (at least four in number) which occurred after the fills and embankments had been constructed. It should be noted, however, that Howard Lane, V & G’s project superintendent, *301 admitted that at least some of the 45,000 cubic yards consisted of suitable material that had been wasted.
The respondent vigorously contends that it consistently advised V & G during the construction of the project that it would not pay for any suitable material that was wasted outside of the template lines as shown on the plans, and various entries from respondent’s job diaries were introduced into evidence to substantiate the fact that these warnings were given. The job diaries further established that respondent called to V & G’s attention the fact that suitable material was being wasted at certain waste pits, and that V & G advised the respondent that such suitable material would be reclaimed later if the same was needed, but that such reclamation was never performed.
While this Court is of the opinion that the respondent’s action in making this deduction was proper, it also feels that the deduction was extreme. The evidence is insufficient to permit this Court to determine the exact amount of the 45,000 cubic yards which constituted fat fill, but it is convinced that certainly a portion thereof constituted fill “in reasonably close conformity” to the template, unsuitable material, and material resulting from slides. Perhaps arbitrarily, the Court is of the opinion that Y & G should be paid for 30% of the 45,000 cubic yards deducted by respondent, or for 13,500 cubic yards at a unit price of $1.27 per cubic yard. Accordingly, an award in favor of the claimant in the amount of $17,145.00 is hereby made. The Court is also of the opinion that V & G is entitled to interest on this award at the rate of six per centum per annum from March 28, 1973, to February 1, 1979, the issuance date of this opinion, in accordance with Code 14-3-1, as hereinafter discussed. Calculated, this interest amounts to $6,017.70, or a total award on this issue of $23,162.70.
Issue No. 5. Interest on Public Contracts
In 1969, the Legislature, in an attempt to protect vendors and contractors dealing with State agencies, enacted Article 3 of Chapter 14 of the West Virginia Code, which requires the payment of interest on public contracts by the State of West Virginia when final payment is delayed. Code 14-3-1 provides in part as follows:
*302 “All public construction contracts relating to roads or bridges let by the state road commissioner, entered into on and after March one, one thousand nine hundred sixty-nine, shall contain the following paragraph:
‘Within one hundred fifty days after the approving authority notifies the contractor, in writing, of the final acceptance by such approving authority of the project for which this contract provides, the balance due the prime contractor shall be paid in full. Should such payment be delayed for more than one hundred fifty days beyond the date that the approving authority notifies the contractor of the final acceptance of the project in accordance with the terms of the contract and the plans and specifications thereof, said prime contractor shall be paid interest, beginning on the one hundred fifty-first day, at the rate of six per centum per annum on such unpaid balance: Provided, that if the prime contractor does not agree to the amount of money determined by the approving authority to be due and owing to the prime contractor and set forth on the final estimate document, and the approving authority makes an offer to pay the amount of the final estimate to the said prime contractor, then the prime contractor shall not be entitled to receive any interest on the amount set forth in said final estimate, but shall only be entitled to the pa3oment of interest at the rate of six per centum per annum on the amount of money finally determined to be due and owing to the said prime contractor, less the amount of the final estimate that the approving authority had originally offered to pay to the said prime contractor.’ ”
The first part of the statute is clear. After a project has been completed and the approving authority notifies the contractor in writing that the same has been accepted, the balance due the prime contractor shall be paid in full, and if not paid within 150 days of the date of acceptance, interest at the rate of six per centum per annum shall be paid on the unpaid balance. It is the proviso portion of the statute which makes the application of the statute difficult.
*303 Project APD-323(23), the U.S. 119 Expressway in Mingo County, was completed by V & G on September 18, 1972, and the project was accepted by the respondent on October 27, 1972. The evidence established that a tentative final estimate was submitted to V & G on May 1, 1973. Apparently, V & G did nothing in respect to the tentative final estimate until August 23, 1973, when V & G wrote a letter to respondent which was received by respondent on August 27, 1973, and in which V & G took exception to the quantities set out in the tentative final estimate. Thereafter, on January 10, 1974, respondent paid V & G the sum of $138,927.40, which was the amount the respondent contended was due and owing V & G under the tentative final estimate. On May 20, 1975, a voucher estimate, which was designated as “Estimate No. 58 & Final”, was accepted and approved by V & G, with V & G reserving its right to file its claim in this Court. Estimate No. 58 & Final reflected that the respondent owed nothing to V & G; on the contrary, it indicated that V & G owed the respondent $6,300.00 as liquidated damages for failing to timely complete this contract. The respondent contends that this instrument is the final estimate referred to in the proviso portion of the code section set out above, and that, consequently, interest cannot be charged to the respondent because this estimate fails to reflect that any monies are due and owing V & G.
This Court does not agree with respondent’s contention. Such a construction of 14-3-1 would completely destroy the obvious intent of the Legislature and would permit the respondent to avoid payment of any interest simply by failing to present a final estimate to an involved contractor.
The project was accepted by the respondent on October 27, 1972, and the 150-day period contemplated by the statute commenced to run as of that date. The respondent became liable for the payment of interest on March 28, 1973 (the 151st day subsequent to October 27, 1972). As indicated earlier, the tentative final estimate was submitted to the contractor on May 1, 1973, which estimate reflected that the contractor was entitled to $138,927.40. The Court is of the opinion that interest should be charged to the respondent from March 28, 1973 to May 1, 1973. The record indicates that, after receiving this tentative *304 final estimate, V & G did nothing until writing its letter of August 23, 1973, which letter was received by respondent on August 27, 1973. This Court does not feel that interest during this period, namely, May 1, 1973 to August 27, 1973, should be charged to respondent. The $138,927.40 was paid by respondent to V & G on January 10, 1974, and the Court believes that interest should be charged to respondent for this period of time, that is, from August 27, 1973 to January 10, 1974. It would thus appear that V & G is entitled to interest for a period of 171 days, which amounts to an interest charge of $3,905.64, and an award in that amount is made in favor of V & G.
Issue No. 6. Additional Construction Layout Stakes (D-993)
This issue is interrelated with Issue No. 4, again arising from the contract entered into between V & G and the respondent dated December 23, 1969, and whereby the former was to construct a segment of U.S. 119 Expressway in Mingo County, West Virginia. As indicated earlier, this project was considered by the respondent to be a waste, or at the very least, a balanced, job. In any event, the proposal submitted by V & G did not contain a line item for the excavation of unclassified borrow material.
During the course of construction, when it was determined and agreed by both parties that there was insufficient material on the job site to complete the slopes and embankments, it was decided that an additional 166,000 cubic yards of material to complete the slopes and embankments would have to be obtained (in engineering parlance, they would have to “lay back the cuts”). In road construction, the contractor does not prepare the plans and specifications but is required to stake out the project (other than the location of the center line) so that the completed highway will conform to the cross sections, etc. This involves an extensive amount of engineering and surveying work, and, as a matter of fact, in V & G’s proposal there was a line item in its bid of $100,000.00 to cover the cost of this work as originally contemplated by the plans and specifications.
As the result of an apparent mistake in the plans and specifications, and for other reasons, it was agreed that V & G would *305 be granted a 96-day extension in order to complete the contract (actually the contract was 117 days late in being completed). During this period of time, additional engineering and surveying work was done in order to “lay back the slopes” to obtain the necessary additional material to complete the slopes and embankments. George Shimmel, Chief Engineer for V & G, testified that he was responsible for making the computations for the engineering stake-out cost overruns on the project, and that the cost to V & G for this additional engineering was $17,933.60. Respondent made no attempt to show that this expense was inflated, but seemed to be distressed by the fact that they had never been furnished an itemized breakdown of this additional expense.
We believe that the claimant has established, by a preponderance of the evidence, that this cost overrun amounted to $17,933.60, through no fault on its part. We thus make an award to the claimant on this particular issue in the amount of $17,933.60. The Court also believes that V & G is entitled to interest on this award at the rate of six per centum per annum from March 28, 1973, to February 1, 1979, the issuance date of this opinion, in accordance with Code 14-3-1, as hereinabove discussed. Calculated, this interest amounts to $6,294.60, or a total award on this issue of $24,228.20.
Issue No. 7. Liquidated Damage Claim (D-993)
This issue, too, arises from Project APD-323(23), Mingo County. The contract, which was dated December 23, 1969, provided that the work on the project was to be completed by October 31, 1971. As earlier indicated and set forth in the written stipulation filed by the parties, a time extension of 96 days was granted, which extended the completion date until July 23, 1973. Nevertheless, the project was not completed until August 17, 1972, amounting to 21 days beyond the revised completion date. As a result, the respondent assessed a liquidated damage penalty against V & G of $300.00 per day, or a total of $6,300.00, all as provided in the contract. V & G contends that the imposition of this penalty was unjustified in view of the many problems that arose during the performance of the work.
The respondent directed a letter to V & G dated January 20, 1975, which was introduced into evidence as Claimant’s Exhibit *306 No. 9. In this letter, the respondent sets forth an analysis of the reason for respondent’s proposal to extend the contract completion date 96 days. For the additional unclassified excavation, a period of 76 days was allowed; for a health hazard strike, 18 days were allowed; and for inclement weather, 2 days were allowed. V & G responded to this letter by their letter of March 11, 1975, which likewise was introduced into evidence. In that letter, V & G did, of course, accept the 96- day extension granted in respondent’s letter of January 20, 1975; but V & G requested an additional extension of 209 days for reasons set forth in the letter.
Respondent contends that the CPM network submitted by V & G stated that work on the project would start on February 6, 1970, in the form of clearing and grubbing, which could be performed during inclement weather. The testimony established that the work actually commenced on March 9, 1970. Consequently, the respondent argues that if work had started in accordance with the CPM, the project would have been completed on time.
One of the requests for a time extension contained in V & G’s letter of March 11, 1975, hereinabove referred to, was set forth in the letter as follows:
“Item 6 — September 28, 1971 letter, we requested forty-five (45) days time extension for the truckers strike and delay in utility relocations that set back Bridges 2798 and 9796. The truckers strike caused delay in pipe delivery which caused us to change our sequence of operations. The delay in utility relocation caused our bridge subcontractor to change his schedule. When this happened, our sub-contractor started other work and when the bridge sites were ready for him, he had not completed his other work; therefore, the delay was compounded.
We request forty-five (45) days for these delays
(Item 6) 45 days”
No additional testimony was introduced at the hearing with respect to the truckers’ strike mentioned in the above-quoted portion of the letter, and the Court is of the opinion that the facts stated in the letter are true. Section 1.8.5 of the Standard *307 Specifications — Roads and Bridges (Adopted 1960) and introduced into evidence as Joint Exhibit 2 provides in part as follows:
“In computing time spent in the execution of the work, working days will not be charged for Saturdays, Sundays or Legal Holidays, unless the Contractor utilizes Saturday as a working day, or for delays due to causes beyond the reasonable control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, acts of the Commission, floods, strikes, state of National emergency, or freight embargoes, provided such delays prevent the Contractor from proceeding toward completion of the current controlling major operation or operations; and providing further that the Contractor has used every reasonable means to remove the cause of such delays.” (Emphasis added.)
The Court is of the opinion that, if the' requested 45-day extension had been partially caused by the truckers’ strike, through no fault of V & G, and there was no evidence to the contrary, some additional extension of time should have been granted.
In the claim of Whitmyer Brothers, Inc. v. The Department of Highways, Claim No. D-571, this Court rejected the Department of Highways’ claim for liquidated damages, and cited 22 Am. Jur. 2d “Damages”, §233, p. 319, as follows:
“The plaintiff cannot recover liquidated damages for a breach for which he is himself responsible or to which he has contributed, and as a rule there can be no apportionment of liquidated damages where both parties are at fault. Hence, if the parties are mutually responsible for the delays, because of which the date fixed by the contract for completion is passed, the obligation under which another date can be substituted, cannot be revived.” (Emphasis added.)
It is apparent that some of the delays resulted from the incorrect plans, which necessitated additional engineering services on the part of the claimant and additional excavation to obtain material for constructing the fills and embankments. *308 Furthermore, there was no evidence as to the amount of actual damage, if any, sustained by the respondent as a result of the delay in constructing this highway, which was another reason this Court in Whitmyer, supra, rejected the liquidated damage claim.
On May 9, 1975, in view of the fact that the final estimate reflected that the claimant owed the respondent $8,300.00 in the form of liquidated damages, the respondent wrote to V & G and requested payment of this sum. Claimant had previously deposited securities with respondent totalling $30,000.00, and, in order to recover these securities, the claimant paid the sum of $6,300.00 to respondent on May 22, 1975. This Court, being of the opinion that the imposition of the liquidated damage charge was improper, hereby awards the claimant the amount of $6,300.00. Furthermore, in accordance with Code 14-3-1, an award of interest at the rate of six per centum per annum from May 22, 1975 to February 1, 1979, which amounts to $1,-298.16, is also made. On this issue an award is thus made in favor of the claimant in the total amount of $7,598.16. As a result of the above, the following awards are hereby made.
Issue No. 1 — No award
Issue No. 2 — Award of $6,201.36
Issue No. 3 — Award of $5,063.21
Issue' No. 4 — Award of $23,162.70
Issue No. 5 — Award of $3,905.64
Issue No. 6 — Award of $24,228.20
Issue No. 7 — Award of $7,598.16
Total award of $70,159.27.